**Andre GRENIER, Plaintiff–Appellant,**

**v.**

**CYANAMID PLASTICS, INC., Defendant–Appellee.**

**No. 95–1313.**

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1995.

Decided Nov. 27, 1995.

---

Roderick H. Potter, Saco, ME, with whom Potter, Prescott, Jamieson & Nelson, was on brief, for appellant.

Jerrol A. Crouter, Portland, ME, with whom Christopher G. Jernigan and Drummond Woodsum & MacMahon, were on brief, for appellee.

Before SELYA and BOUDIN, Circuit Judges, and SARIS,* District Judge.

SARIS, District Judge.

Appellant Andre Grenier ("Grenier") was employed as an electrician for Cyanamid Plastics, Inc., d/b/a Cyro Industries ("Cyro"), for several years before he was placed on disability leave due to psychological problems. After his employment had officially terminated by automatic operation of the company disability policy, but while still receiving disability benefits, Grenier notified Cyro that he was an individual with a disability who needed reasonable accommodation to return to work and applied to be re-hired into his previous position. Before making him a job offer, Cyro requested Grenier to provide certification from his physician stating that he was prepared to return to work without restrictions or identifying the reasonable accommodations necessary for him to return to work. When Grenier failed to do so, his application was rejected.

* Of the District of Massachusetts, sitting by designation.

The difficult issue on appeal is whether Cyro violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(d), which prohibits certain preemployment medical examinations and inquiries of a job applicant. Concluding that Cyro did not violate this provision of the ADA, we affirm the district court's entry of summary judgment for Cyro.

## I. *STATEMENT OF THE CASE*

### A. Facts

Reviewing the factual record in the light most favorable to the nonmoving party, as we must at summary judgment, *see Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992), we treat the following facts as undisputed.

### 1. The Disability Leave

Andre Grenier worked as a shift electrician for Cyro at its plant in Sanford, Maine, from 1980 to 1989. Grenier's technical skill as an electrician was good. In 1989, Grenier and several other employees were questioned about vandalism of plant machinery that had occurred during their shift. Grenier responded to the questioning "in a highly emotional and irrational manner" and failed to report to his next scheduled shift. He informed his supervisor, William Kennedy, that he was afraid to be on a shift without an alibi, and that he was "losing it." Stating that Grenier's behavior was "very disruptive and potentially dangerous," Kennedy placed Grenier on medical leave in November 1989. This leave was explicitly "until such a time when you can be cleared by our medical department to return to work." Kennedy informed Grenier in writing that in order to return he would have to go through the standard reentry screening process, including permitting his doctors to discuss the specifics of his case with the company doctor.

In August 1990, Grenier mailed the first of a series of letters to Cyro, including a one-page letter received September 27, 1990, and a six-page "statement" of April 11, 1991. In these letters, Grenier criticized the plant manager Skip Brogli and complained that company actions in investigating vandalism

at the plant and placing him on medical leave had caused him to suffer increased anxiety. He attacked several policies of the plant that he claimed were a "constant source of aggravation" to him. He also discussed in detail various collateral issues, such as the criminal charges faced by the son of a Cyro manager, a sexual harassment investigation of a fellow employee, and various transfers of Cyro managers.

Grenier informed Cyro in his letters that his analyst Dr. Stewart "describes me as being Narcissistic," but noted that "I prefer the word 'proud.'" He stated that "Dr. Stewart also describes me as having 'somewhat paranoid beliefs concerning the malevolent intent of the (relatively new) management.'" He also noted that "[a]fter a year and a half of being unable to work, my analyst feels that it would be in my best interests to quit my job and find another ... that I've become obsessed with this Skip guy [manager Skip Brogli]." He stated repeatedly, however, that he refused to quit his job.

"As a final note," wrote Grenier in one letter, dated April 11, 1991, "I want to point that [sic], although Dr. Stewart is indicating that he feels that I am not totally disabled, I still feel convinced that I am." Grenier realized his statement had "some strong elements of paranoia," but claimed that "the paranoia is not just my own ... it has become fairly rampant throughout the workforce." And:

> The continuing incidents of vandalism, recently, should be a clear signal to Corporate headquarters that Cyro Industries, in Sanford, Me. is still more than just a little bit sick.
>
> There is still some hope, however, if only the right steps are taken. And unless the right steps are taken, somebody else is going to be hurt, maybe even killed. Of that, I am sure.

Grenier would not voluntarily terminate his employment. He remained on indefinite disability leave until May 12, 1991, when his employment at Cyro terminated automatically as a result of the expiration of his continuous service credits. Cyro informed Grenier of his termination by letter May 15, 1991.

Grenier received disability benefits from Cyro for a two-year period ending December 31, 1992. Under the company's plan, benefits were payable for up to two years if Grenier was under the regular care of a licensed physician and unable to perform the duties of his specific job, but benefits would have continued beyond this period only if the Disability Department determined that his medical condition prevented him "from working at any job for which [he was] reasonably qualified to perform." On December 4, 1992, the Cyro disability department wrote Grenier that based on information received from an independent medical examination of July 30, 1992, he was not disabled to this extent and, therefore, no benefits were payable after January 1, 1993.

## 2. Application for Re-Employment

In a letter dated December 18, 1992, and addressed to Robert Lysaght, the Personnel Operations Manager at the Sanford plant, Grenier asked to be considered an applicant for the job of shift electrician, his former position. Grenier was still receiving disability benefits at this time. In this letter, which was under the heading "request for employment accommodation," Grenier stated:

I qualify as an individual with a disability as defined by Federal and State Civil Rights laws.

I understand that CYRO Industries is conducting interviews for the position of shift mechanic in the electrical department. The purpose of this letter is to request accommodation to return to work in the same capacity as I had been working since September of 1980.

. . . . .

I believe that I should be afforded the opportunity to be accommodated to return to my job, at the very least, for a trial period, to prove that I am able to perform my job.

I believe that, under reasonable circumstances, I should be able to perform in a safe and reliable manner.

In response, Lysaght told Grenier in a January 5, 1993, letter that "CYRO is not currently accepting applications" but that the Maine unemployment office would be notified when Cyro was soliciting applications. In reality, a job notice was posted on January 4, 1993—subsequent to Grenier's request for consideration as an applicant, but prior to the date of Lysaght's response. Lysaght requested in his letter:

Since your termination of employment came as a result of the expiration of Continuous Service Credits while you were on an extended medical leave, CYRO would reasonably request that you provide us with certification from a physician that you are prepared to return to work without restrictions or identifying any accommodations that are required for you to return to work at the Sanford location. Of course, any requests for employment accommodation will be considered with regard to the reasonableness at the time of the employment interview process.

Therefore, in order to return to work with CYRO Industries you need 1) keep in touch with the Maine Unemployment office in Sanford to learn when CYRO is accepting employment applications; 2) complete an employment application for a position for which you are qualified; and 3) provide CYRO with notice from your physician that you are prepared to return to work without restrictions or identifying those reasonable accommodations that may be necessary.

By letter of January 15, 1993, Grenier forwarded his therapist's certification that he was disabled and requested to discuss accommodation with Cyro Vice President William Loman. He also maintained that his employment had never terminated, and argued that the May 15, 1991, letter that informed him of the termination "simply implies that my employment is terminated."

Cyro's New Jersey-based Personnel Director Thomas Ayres responded by letter of January 25th by informing Grenier that he must follow the steps outlined in Lysaght's January 5th letter in order to be considered for employment.

Additional correspondence ensued. Grenier asserted that he was "capable of performing the essential functions of the job with or without accommodation" but failed to de-

scribe how he would perform and refused to provide medical documentation. Cyro continued to request the documentation.

On February 22, 1993, Cyro mailed Grenier an employment application, which Grenier promptly returned. By letter of March 15, 1993, Cyro rejected Grenier's application for employment, stating that, "[a]fter careful review of all relevant information, your request for employment consideration is denied."

### B. Proceedings Below

Grenier filed a two-count complaint in the District of Maine on June 23, 1994, claiming that Cyro violated the ADA and the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.*[1] Cyro filed a motion for summary judgment on the issue of pre-offer inquiries, and Grenier opposed the motion on the same grounds. The District Court entered summary judgment for Cyro. Grenier argues on appeal that Cyro's pre-offer inquiry violated the ADA and that there are genuine issues of material fact with respect to his claim that Cyro's failure to hire him constituted intentional discrimination.

### II. *ANALYSIS*

### A. Standard of Review

This court reviews the district court's grant of summary judgment *de novo*. The standard of review has been clearly articulated by this court as follows:

> Since appellate review of a grant of summary judgment is plenary, the court of appeals, like the district court, "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground. In the end, the entry of summary judgment can be upheld only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991) (citations omitted), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

### B. Statutory Framework

A close analysis of the statutory and regulatory framework is essential to determine the employer's obligations under the ADA when dealing with the known disability of a job applicant.

### 1. The Statute

The ADA, 42 U.S.C. § 12101 *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). In the context of employment, the ADA provides:

> (a) **General rule.** No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

With regard to medical examinations and inquiries, the ADA sets up separate rules for pre-offer job applications, § 12112(d)(2); post-offer pre-employment examinations, § 12112(d)(3); and inquiries of current employees, § 12112(d)(4). Section 12112(d) provides as follows:

> (d) Medical examinations and inquiries.
> (1) In general. The prohibition against discrimination as referred to in [§ 12112(a) ] shall include medical examinations and inquiries.
> (2) Preemployment.
> > (A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries

---

1. As the parties acknowledge that federal law controls construction of the state claim, we do not discuss it separately.

of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

Pursuant to paragraph (3), an employer may "require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of employment duties, and may condition an offer of employment on the results of such examination" only in certain circumstances.[2] Once an applicant becomes an employee, an employer is prohibited from requiring a medical examination or making inquiries of an employee as to whether he is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity." § 12112(d)(4). An employer may make "inquiries into the ability of an employee to perform job-related functions." § 12112(d)(4)(B).

## 2. The Regulations

The regulations adopted under the ADA by the Equal Employment Opportunity Commission ("EEOC") provide that an employer may make "pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions." 29 C.F.R. § 1630.14(a). The EEOC crafted § 1630.14(a) in response to comments on the proposed regulation from employers asking "whether an employer may ask how an individual will perform a job function when the individual's known disability appears to interfere with or prevent per-

formance of job-related functions." 56 Fed. Reg. 35725, 35732 (1991).

The EEOC published as an appendix to the regulations a section-by-section "Interpretive Guidance on Title I of the Americans with Disabilities Act." 29 C.F.R. Pt. 1630, App. We have looked to this source in interpreting the ADA. See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n, 37 F.3d 12, 16 (1st Cir.1994). Such administrative interpretations of the Act by the enforcing agency, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

The EEOC explains the regulation § 1630.14(a) as follows:

An employer may also ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions. Such a request may also be made of all applicants in the same job category regardless of disability. Such a request may also be made of an applicant whose known disability may interfere with or prevent the performance of a job-related function, whether or not the employer routinely makes such a request of all applicants in the job category. For example, an employer may ask an individual with one leg who applies for a position as a home washing machine repairman to demonstrate or to explain how, with or without accommodation, he would be able to transport himself and his tools down the basement stairs. However, the employer may not inquire as to the nature or severity of the disability. Therefore, for example, the employer cannot ask how the individual

(A) all entering employees are subjected to such an examination regardless of disability;
(B) information obtained [is kept confidential, with limited exceptions]; and
(C) the results of such examination are used only in accordance with this subchapter.

---

2. This section provides in relevant part:

(3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

lost the leg or whether the loss of the leg is indicative of an underlying impairment.

### 3. The Guidance

An EEOC Enforcement Guidance, dated May 19, 1994,[3] further aids our interpretation of the rules concerning pre-offer inquiries of applicants with known disabilities. *See* Equal Employment Opportunity Comm'n, *Enforcement Guidance: Preemployment Disability–Related Inquiries and Medical Examinations Under the Americans with Disabilities Act of 1990* (EEOC Notice 915.002) (May 19, 1994) [hereinafter *Guidance* ]. The Guidance was designed "for interim use by EEOC investigators, pending coordination with other federal agencies." *Id.*, Exec.Summ. It is not binding law, but as a detailed analysis of the relevant ADA provisions, it aids our interpretation of the statute.

In a section entitled "When the Employer Could Reasonably Believe that Known Disability Will Interfere With Performance of Job Related Functions," the Guidance provides:

> When an employer could reasonably believe that an applicant's known disability will interfere with the performance of a job-related function, the employer may ask that particular applicant to describe or demonstrate how s/he would perform the function, with or without reasonable accommodation. Such inquiries or requests are not prohibited pre-offer inquiries.
>
> *Example 5:* R may ask an applicant with one leg who applies for a job as a telephone linesperson to describe or demonstrate how she would perform the duties of the job, because R may reasonably believe that having one leg interferes with the ability to climb telephone poles.
>
> In some cases, an applicant may not have an obvious disability, but may voluntarily disclose that s/he has a hidden disability that would reasonably appear to interfere with performance of a job-related function.

> In such cases, the employer may ask the applicant to describe or demonstrate performance, with or without reasonable accommodation. Such inquiries or requests are not prohibited pre-offer inquiries.
>
> *Example 6:* An applicant for the job of repairing underground sewer lines voluntarily discloses that she has severe claustrophobia. R may reasonably determine that severe claustrophobia would interfere with an employee's ability to work within the confined space of an underground sewer. R may therefore ask the applicant to describe or demonstrate how she would perform the job, with or without reasonable accommodation.

*Guidance* § IV.B.5.b.

The EEOC explains that allowing an employer to ask an applicant with a known disability to describe or demonstrate how he would perform a job-related function "is in the interest of both applicants and employers." *Id.* at n. 23.

> Employers are entitled to know whether an applicant with an apparently interfering disability can perform job-related functions, with or without reasonable accommodation. It is in the interest of an applicant with such a disability to describe or demonstrate performance in order to dispel notions that s/he is unable to perform the job because of the disability.

*Id.*

In a section entitled "Inquiries Concerning Need for Accommodation and Requests for Documentation if Applicant Asks for Accommodation," the Guidance permits an employer during the hiring process to require an applicant "to inform the employer of any reasonable accommodation needed" to take an "interview" or perform a "job demonstration." *Id.* § IV.B.6.a. With respect to accommodations for the job, as opposed to accommodations for the hiring process, the Guidance explains:

> An employer may ask an applicant whether s/he can perform specified job-related

---

**3.** Both parties refer us to this Guidance although it was published after the decision by Cyro to reject Grenier's application. We note that a revised version of the Guidance was issued October 10, 1995, after oral argument in this case. *See*

Equal Employment Opportunity Comm'n, *Enforcement Guidance: Pre–Employment Disability–Related Questions and Medical Examinations* (Oct. 10, 1995) (reprinted in *EEOC* Compl.Man. (CCH) ¶ 6093, at 5371).

functions with or without reasonable accommodation, because these inquiries elicit information about an applicant's *ability* to perform job functions, not information about an applicant's disability. An employer also may ask an applicant to describe or demonstrate, at the pre-offer stage, how s/he would perform job-related functions, with or without reasonable accommodation, because these inquiries elicit information about an applicant's *ability*, not information about an applicant's disability....

However, at the pre-offer stage, an employer may not generally inquire whether the applicant needs reasonable accommodation for the job. For example, an employer may not make inquiries such as, "Would you need reasonable accommodation in this job?" or "Would you need reasonable accommodation to perform this specific function?" Such inquiries are likely to elicit information about the existence of a disability because, generally, only an individual with a disability would require an accommodation. Therefore, these inquiries are prohibited at the pre-offer stage.

If an applicant has voluntarily disclosed that s/he would need a reasonable accommodation to perform the job, the employer still may not make inquiries at the pre-offer stage about the *type* of required reasonable accommodation (except where the applicant has requested reasonable accommodation as part of a required pre-offer job demonstration, as described above).

*Id.* § IV.B.6.a (emphasis in original).

When an applicant requests reasonable accommodation, an employer may request "documentation from an appropriate professional (e.g., a doctor, rehabilitation counsellor, etc.), stating that s/he has a disability." *Id.* § IV.B.6.b. An employer may also require documentation as to an applicant's functional limitations "for which reasonable accommodation is requested (and which flow from the disability.)" *Id.* The EEOC reasoned that such requests are not prohibited pre-offer inquiries because:

Requesting such documentation is consistent with the ADA's legislative history.

For example, Congress specifically anticipated that when an applicant requests reasonable accommodation for the application process (or when an employee requests reasonable accommodation for the job), *the employer should engage in an interactive process with the individual to determine an effective reasonable accommodation.*

*Id.* (emphasis added). As an example, the EEOC stated that an employer may at the pre-offer stage require an applicant to obtain documentation from a professional stating she cannot lift a certain amount and needs reasonable accommodation. *Id.*

## C. The Pre–Offer Inquiry

With this statutory and regulatory framework in mind, we turn to Grenier's claim that Cyro's requirement of a medical certification violates ADA § 12112(d).

### 1. Getting Along

■ First, Grenier argues that Cyro's letter requiring a medical certification constituted an impermissible inquiry because the request was not for information about how he would perform the job-related functions. Rather than ask "whether he possessed the requisite skills to perform the electrical and electronic tasks called for in the job description," Grenier complains, "Cyro assumed that his ability to perform job related functions was called into question by his history of mental illness." Grenier argues that Cyro already had knowledge that he was able to do the essential job-related functions because he had worked there for nine years and was "technically qualified."

Grenier incorrectly assumes that the essential functions of the job of shift electrician require only technical ability and experience as an electrician. "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Technical skills and experience are not the only essential requirements of a job. *See Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 441–42 (6th Cir.1991) ("at least the ability to get along with supervisors and co-workers" was essential function of job as tool room attendant); *Mancini v.*

*General Electric Co.,* 820 F.Supp. 141, 147 (D.Vt.1993) ("ability to follow the orders of superiors is an essential function of any position"); *Pickard v. Widnall,* 1994 WL 851282, *9 (S.D.Ohio, Dec. 15, 1994) (No. C–3–94–40) ("mental and emotional stability" was essential job function for military position); *Johnston v. Morrison,* 849 F.Supp. 777, 778 (N.D.Ala.1994) (waitress who was unable to handle pressures of working on crowded nights or memorizing frequent menu changes was unable to perform essential functions of job); *cf. Bento v. I.T.O. Corp. of Rhode Island,* 599 F.Supp. 731, 742–43 (D.R.I.1984) (although there is "no question that plaintiff ... is qualified to do the job, at least in the sense of knowing how to perform it," he is not necessarily "otherwise qualified" within the meaning of the Rehabilitation Act).

More specifically, an employer may reasonably believe that an employee known to have a paranoia about the plant manager is not able to perform his job. *Cf. Voytek v. University of California,* 1994 WL 478805, *15, 6 A.D.D. 1137, 1161 (N.D.Cal., Aug. 25, 1994) (No. C–9203465 EFL) (holding that employee was legally denied re-employment after period of disability where he "could not continue to perform all of the tasks assigned to him," due in part to "the ongoing conflict with his supervisor").

The ADA does not require an employer to wear blinders to a known disability at the pre-offer stage, but permits an "interactive process" beneficial to both the employer and applicant. The EEOC regulations recognize this by providing that an employer can ask an applicant with a known disability to describe or demonstrate how "with or without reasonable accommodation" the applicant will be able to do the job. 29 C.F.R. § 1630.14(a). Here, Cyro knew that the applicant had just recently been unable to perform his specific job at Cyro as a result of a mental disability for which he was still receiving benefits from Cyro and undergoing

psychiatric treatment. Indeed, Grenier himself had claimed he was totally disabled from performing any work, not just his specific job at Cyro. *Cf. August v. Offices Unlimited, Inc.,* 981 F.2d 576, 581–82 (1st Cir.1992) (man who had asserted on insurance forms that he was "totally disabled" and had presented no contrary evidence could not be found to be "qualified handicapped person" under Massachusetts anti-discrimination statute, Mass. Gen.L. ch. 151B); *Reigel v. Kaiser Found. Health Plan,* 859 F.Supp. 963, 969 (E.D.N.C. 1994) (woman who certified to her disability insurer that she could not perform her job was estopped from asserting that during the same time period she had been qualified to perform for purposes of the ADA). We hold that this employer did not violate the prohibition in § 12112(d) by inquiring into Grenier's ability to function effectively in the workplace and to get along with his co-workers and supervisor, rather than just his technical qualifications as an electrician.[4]

## 2. The Medical Certification

Next Grenier argues that Cyro's pre-offer requirement of a medical certification is an illegal pre-offer inquiry under the ADA because the regulations "do not by their terms permit a request to someone other than the applicant at the preoffer stage."

As a preliminary matter, we address whether a request for medical certification constitutes a "medical examination" or whether it is instead an "inquiry." The ADA prohibits an employer from conducting any pre-offer "medical examination" of a job applicant. § 12112(d)(2). This prohibition applies to psychological examinations. *See Guidance* at n. 47 (citing H.R.Rep. No. 485 (Pt. 3), 101st Cong., 2d Sess. 46 (1990), *reprinted in* 1990 U.S.C.C.A.N. vol. 4, Leg-is.Hist., 445, 469). The EEOC defined "medical examination" as follows:

---

4. We note that the inquiry made by Cyro would not necessarily be permissible under different circumstances, such as where the employer was less familiar with the nature or extent of the applicant's disability, or with the effect of the disability on job performance. As the EEOC recognized when preparing the Guidance, "there are sometimes subtle distinctions between a per-

missible and a prohibited pre-offer inquiry." *Guidance* § IV.B.6.b. *See generally* Paul F. Mickey, Jr. & Maryelena Pardo, *Dealing with Mental Disabilities Under the ADA,* 9 Lab.Law. 531 (1993); Janet L. Hamilton, *New Protections for Persons with Mental Illness in the Workplace under the Americans with Disabilities Act of 1990,* 40 Clev.St.L.Rev. 63, 92 (1992).

Medical examinations are procedures or tests that seek information about the existence, nature, or severity of an individual's physical or mental impairment, or that seek information regarding an individual's physical or psychological health.

*Guidance* § V.A. We conclude that a certification from a treating psychiatrist that does not necessitate new tests or procedures is best analyzed as an "inquiry" rather than as a "medical examination."

■ Also, contrary to Grenier's assertion, the EEOC interprets the ADA to allow certain inquiries of third parties at the pre-offer stage. With respect to "inquiries to third parties regarding an applicant's medical condition," the Guidance provides that "[a]t the pre-offer stage", an employer can "ask a third party (*e.g.*, a reference) anything that it could ask the applicant directly." *Guidance* § IV.B.15. Further, the EEOC finds that requests for documentation from health care providers to confirm the existence of a disability are permissible where, as here, requests for reasonable accommodation are made in connection with the hiring process or job. *See Guidance* § IV.B.6.b. We conclude that an employer may request that an applicant provide medical certification from doctors of ability to perform so long as the inquiry does not otherwise run afoul of § 12112(d)(2)(A).

The primary thrust of Grenier's appeal is that this inquiry—the requirement of medical certification of ability to perform from a former disabled employee applying to return to work with the same employer—violates § 12112(d)(2)(A) in that it constitutes an inquiry of a "job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability."

The Eighth Circuit recently addressed a similar factual situation in *Brumley v. Pena*, 62 F.3d 277 (8th Cir.1995), a case decided under the Rehabilitation Act, and applicable regulations.[5] Brumley was a mentally disabled former employee of the Federal Aviation Administration ("FAA") who sought priority consideration for restoration to federal employment pursuant to 5 U.S.C. § 8151, which predicated the level of priority for re-employment on the extent of recovery from the disability. He challenged the agency's demand for a pre-employment examination by a psychiatrist to determine whether he was fully or only partially recovered from his severe reactive depression. *Id.* at 279. In questioning the application of the regulations, the court noted that "[t]he dilemma here is that Brumley is not an outside job applicant seeking employment at the FAA for the first time." *Id.* "Rather, he is a recipient of ... disability payments who is seeking to exercise his re-employment rights with the FAA pursuant to [5 U.S.C. § 8151]." *Id.* The court concluded that the employer "retains the right to require that [the former employee's] medical condition be verified in order to determine his re-employment rights." *Id.* at 279.

■ As in *Brumley*, this Court faces the quandary of determining the appropriate parameters of a pre-offer inquiry of a former employee who is the recipient of disability benefits and now seeks re-employment. Cyro argues that an employer should not be forced to have "amnesia" with respect to a former employee where it is well aware of the nature and severity of that employee's disability because it had previously received medical information that formed the basis for its determination of eligibility for disability benefits. Rather, it urges, Grenier should be treated as an existing employee returning from disability leave, in which case the em-

---

**5.** The ADA extended to the private sector the essential substantive provisions of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791–794. *See* Chai R. Feldblum, *Medical Examinations and Inquiries under the Americans with Disabilities Act: A View from the Inside*, 64 Temple L.Rev. 521, 521–22 (1991). Congress intended that Rehabilitation Act precedent be considered by the courts in interpreting the ADA. *See* 42 U.S.C. § 12201(a); *see also Ennis v. National Ass'n of*

*Business & Educational Radio, Inc.*, 53 F.3d 55, 57 (4th Cir.1995) ("To the extent possible, we adjudicate ADA claims in a manner consistent with decisions interpreting the Rehabilitation Act."). Specifically, the ADA's statutory provisions on medical examinations and inquiries were drawn from Rehabilitation Act regulations. *See* 29 C.F.R. § 1614.203(e) (formerly § 1614.706); 45 C.F.R. § 84.14.

ployer would be able to demand medical certification of ability to return to work. *See* 42 U.S.C. § 12112(d)(4) (ADA provisions for medical examinations of existing employees); *Hogan v. Bangor and Aroostook R.R. Co.,* 61 F.3d 1034, 1036 (1st Cir.1995) (employee was entitled to reinstatement after suffering collapsed lung as soon as medical evidence indicated he was fit to return); *Pesterfield,* 941 F.2d at 438 (employee who was hospitalized for psychiatric treatment was required to provide medical certification as to ability to return to work); *Derbis v. United States Shoe Corp.,* 1994 WL 631155, *5, 6 A.D.D. 1071, 1075, 3 A.D.Cas. 1029, 1030, 65 Fair Empl.Prac.Cas. (BNA) 1328 (D.Md., Sept. 7, 1994) (No. MJG–93–130) (where plaintiff on disability leave presented a medical report which indicated the employee could return to work but only with some accommodation, employer could require sufficient information to allow it to consider any possible reasonable accommodation), *aff'd in part and remanded for further proceedings,* 67 F.3d 294 (4th Cir.1995) (table). We agree that this case is similar to that of an employee returning from disability leave. It appears that neither Congress nor the EEOC took into account the case of a returning employee when formulating the restrictions on pre-offer inquiries. Here, as in the case of the returning employee, the employer must be able to assess the extent of the applicant's recovery from inability to perform. Further, if accommodations are necessary to enable job performance, the employer, who is already familiar with the disability, must learn of those accommodations in order to have any realistic chance of assessing ability to perform.

Grenier contends that the ADA as interpreted in the Guidance prohibits an employer's requirement that a physician identify the *type of* reasonable accommodations required for an employee to return to work. The Guidance states: "If an applicant has voluntarily disclosed that s/he would need a reasonable accommodation to perform the job,

the employer still may not make inquiries at the pre-offer stage about the *type* of required reasonable accommodation." *Guidance* § IV.B.6.a.

We conclude that the ADA does not preclude an employer from asking an applicant with a *known* disability who seeks a reasonable accommodation to specify the type of accommodation he seeks. As the District Court pointed out, the Guidance prohibits pre-offer inquiry into the type of accommodation because it is "likely to elicit information about the nature and severity of a disability." *Guidance* § IV.B.6.a. The central purpose of the prohibition on pre-offer inquiries generally is to ensure that an applicant's hidden disability remains hidden. *See* H.R.Rep. No. 485 (Pt. 2), 101st Cong., 2d Sess., at 73, *reprinted in* 1990 U.S.C.C.A.N. vol. 4, Legis.Hist., 303, 355 ("The legislation prohibits any identification of a disability by inquiry or examination at the pre-offer stage."); *Guidance* § IV.A ("This prohibition is to ensure that an applicant's possible hidden disability (including prior history of a disability) is not considered by the employer prior to the assessment of the applicant's non-medical qualifications.").

With respect to known disabilities, however, the emphasis is on encouraging the employer to "engage in an interactive process with the individual to determine an effective reasonable accommodation." *Guidance* § IV.B.6.b (citing H.R.Rep. No. 485 (Pt. 2), *supra,* at 65–66, U.S.C.C.A.N. at 347–48). That is why the EEOC allows an employer to ask an applicant with known claustrophobia to describe pre-offer how she would perform the job, with or without reasonable accommodation. There could be no meaningful interaction if this court would accept the strict interpretation Grenier presses on us that an employer who knows the precise nature of a disability that interferes with essential job functions cannot, on being informed pre-offer that accommodation will be necessary, follow up with the logical question "what kind?" [6]

---

**6.** On October 10, 1995, subsequent to oral argument, the EEOC issued a new Guidance. Although neither party has argued that we ought to consider this newest guidance, we note that the EEOC has revised its interpretation of the ADA

and now reaches the same conclusion. Under a section headed "The Pre–Offer Stage," the EEOC now explains:

However, when an employer could reasonably believe that an applicant will need reasonable

In sum, an employer does not violate § 12112(d)(2) of the ADA by requiring a former employee with a recent known disability applying for re-employment to provide medical certification as to ability to return to work with or without reasonable accommodation, and as to the type of any reasonable accommodation necessary, as long as it is relevant to the assessment of ability to perform essential job functions.

### D. Intentional Discrimination in Denial of Application

Finally, Grenier argues on appeal that there remain genuine issues of material fact as to his argument that Cyro intentionally discriminated against him in violation of 42 U.S.C. § 12112(a), as opposed to § 12112(d). Grenier argues that, even if Cyro did not violate the specific restrictions on pre-offer inquiries, there is a genuine dispute of material fact whether Cyro illegally discriminated against Grenier based upon his disability when it denied his application for employment.

■ By failing to make this argument in his opposition to summary judgment, Grenier has failed to preserve this claim. "It is by now axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal." *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979). This rule may be relaxed only "in horrendous cases where a gross miscarriage of justice would occur." *Id.* (quoting *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir.1976)). For a new argument to be considered, it must be "so compelling as virtually to insure appellant's success." *Id.* (quoting *Dobb v. Baker*, 505 F.2d 1041, 1044 (1st Cir.1974)).

■ Even an issue raised in the complaint but ignored at summary judgment may be deemed waived. "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." *Vaughner v. Pulito*, 804 F.2d 873, 877 n. 2

(5th Cir.1986); *see also Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir.1983). This is because "an appellate court, in reviewing a summary judgment order, can only consider those matters presented to the district court." *Frank C. Bailey Enterprises, Inc. v. Cargill, Inc.*, 582 F.2d 333, 334 (5th Cir.1978).

■ Although this alternative argument can be found in the complaint, and Grenier asserts it would have been raised at trial, this does not suffice to preserve the issue. Cyro moved for summary judgment on all counts based solely on the validity of the pre-offer inquiry under § 12112(d). Grenier argued only that issue in his brief. Although he made an oblique reference in his memorandum opposing summary judgment to Cyro's failure to challenge or admit his "ultimate contention that Andre was discriminated against on the basis of his disability by the rejection of his application," he concedes he never addressed the alternative claim of intentional discrimination. The only related evidence Grenier discussed in his "statement of material facts" at summary judgment was that Lysaght stated on January 5, 1993 that Cyro was not seeking applicants, when it had in fact given notice of the job opening the day before. *See Ennis v. National Ass'n of Business & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995) (discussing prima facie elements of claim under § 12112(a)). After the judge entered final judgment once he had determined that Cyro was entitled to summary judgment on the issue of preemployment medical inquiries, no motion for reconsideration was filed. There is nothing in the record which persuades us to exercise our discretion to bend the raise-or-waive rule.

### III. CONCLUSION

For the foregoing reasons, the District Court's grant of summary judgment is **AFFIRMED.**

---

accommodation to perform the functions of the job, the employer may ask that applicant certain limited questions. Specifically, the employer may ask *whether s/he needs reasonable accommodation* and *what type of reasonable*

*accommodation* would be needed to perform the functions of the job.
*Enforcement Guidance: Pre–Employment Disability–Related Questions and Medical Examinations* (Oct. 10, 1995) (emphasis in original).