USCA1 Opinion

 

United States Court of Appeals 
 For the First Circuit
 ____________________
No. 98-1459
 CAROLYN E. McMAHON,
 Plaintiff, Appellant,
 v.
DIGITAL EQUIPMENT CORPORATION, CORE, INC., and PLAN ADMINISTRATOR
 OF DIGITAL EQUIPMENT CORPORATION ACCIDENT AND SICKNESS PLAN, 
 
 Defendants, Appellees.
 ____________________
 APPEAL FROM THE UNITED STATES DISTRICT COURT 
 FOR THE DISTRICT OF MASSACHUSETTS
 [Hon. Robert B. Collings, U.S. Magistrate Judge]
 ____________________
 Before
 Boudin, Circuit Judge,
 Bownes, Senior Circuit Judge,
 and Lynch, Circuit Judge.
 ____________________
 
 Marie Cheung-Truslow with whom Lecomte, Emanuelson,
Motejunas & Doyle was on brief for appellant.
 David C. Casey with whom Laurie F. Rubin and Peckham,
Lobel, Casey, Prince & Tye were on brief for appellees Digital
Equipment Corporation and Plan Administrator of Digital Equipment
Corporation Accident and Sickness Plan.
 Brian C. Duffey with whom Mark E. Cohen and McCormack &
Epstein were on brief for appellee Core, Inc.

 ____________________
 December 4, 1998
 ____________________
 LYNCH, Circuit Judge. Carolyn McMahon, a five-year
employee of the Digital Equipment Corporation ("Digital"), accepted
a new job with Digital in a town one hundred miles from her home. 
After McMahon's back condition worsened as a result of her new,
more demanding commute, Digital declined to offer relocation
benefits, but did place McMahon on short-term disability leave for
several months. Once it determined that McMahon was no longer
disabled under the terms of its disability policy, Digital required
her to return to work, and then terminated her four days later as
part of a general reduction in workforce.
 McMahon believed that Digital was obligated to relocate
her, and further, that she was still disabled, and therefore both
eligible for additional disability benefits and protected from lay-
off. She sued Digital, the Plan Administrator of Digital's short-
term and long-term disability plans, and CORE, Inc. ("CORE"), the
manager of Digital's short-term disability program, alleging breach
of contract, negligence, interference with an advantageous
relationship, and unfair trade practices, as well as violations of
the Employee Retirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. 1001 et seq. After removal, the federal district court
granted the defendants' motions for summary judgment, finding
McMahon's state law claims preempted by ERISA and her federal claim
for long-term disability benefits under ERISA barred for failure to
exhaust administrative remedies. 
 We address the following central question on appeal: Did
McMahon's short-term disability benefits derive from an ERISA plan
or merely a "payroll practice"? If McMahon's benefits stemmed from
a "payroll practice" as that term is defined by Department of Labor
regulations, then McMahon's core state law claims are not preempted
by federal law. McMahon argues that Digital had several distinct
short-term disability plans and that the particular plan that
provided her benefits was a payroll practice because it was funded
solely from Digital's general assets. 
 After a careful review of the undisputed facts, we
affirm. We find that McMahon's short-term disability benefits did
derive from an ERISA plan rather than a payroll practice and that
all but one of her state law claims are therefore preempted. The
one non-preempted state law claim, which is based on Digital's
alleged promise to relocate McMahon, fails on the merits. Finally,
we find none of McMahon's federal claims under ERISA to be viable:
she no longer pursues a claim for long-term disability benefits,
her claim for short-term disability benefits fails on the merits,
and her claim for wrongful discharge has been waived.
 I
 We review the district court's grant of summary judgment
de novo, and view all facts in the light most favorable to McMahon,
drawing all reasonable inferences in her favor. See Aponte Matosv. Toledo Davila, 135 F.3d 182, 186 (1st Cir. 1998). Given the
variety of McMahon's arguments, it is necessary to describe the
facts at some length.
A. The Transfer to Marlboro
 Digital hired McMahon as a principal marketing specialist 
for its Tewksbury, Massachusetts office in April of 1985. In
November of 1990, Digital offered McMahon a new position as a
marketing consultant at its Marlboro, Massachusetts facility. 
McMahon was concerned that the one hundred mile one-way commute to
Marlboro from her home in Nashua, New Hampshire might aggravate a
preexisting back problem. When she mentioned this concern to the
hiring manager, Thomas Dimieri, he brought up the possibility of
relocation and showed McMahon Digital's written policy on
relocation. 
 This policy, contained in Section 5.05 of Digital's
policy manual, stated that "Digital reimburses certain costs for
regular employees when they are offered and accept a position which
meets relocation criteria and when the employee's circumstances
qualify under the relocation policy eligibility criteria." Section
5.05 listed the following four points under the heading
"Eligibility": 

 Requisition for Personnel For Relocation expenses to
 be paid the Requisition for Personnel must be approved
 and budgeted for Relocation by the appropriate management
 levels. 
 Mileage Qualification In order to qualify for
 relocation benefits, . . . an employee[']s one way
 commute from current residence to new work location must
 increase by 35 miles . . . [or] an employee's one way
 commute . . . [must] exceed[] 60 miles . . . .
 Timing of Relocation Employees are expected to
 complete relocation activity within six months of their
 date of transfer.
 Authorization In order to start the relocation
 process a Relocation Authorization Form must be completed
 and signed by the appropriate level of management.

Dimieri noted that McMahon would meet the mileage qualification if
she accepted the position in Marlboro, and promised to help her
apply for relocation benefits if her back condition made relocation
necessary.
 Dimieri himself had no authority to determine whether
McMahon would receive relocation benefits. However, McMahon
interpreted their conversation to mean that relocation benefits
were essentially "a given" under Section 5.05 if the mileage
criteria were met. 
 McMahon's written offer for the Marlboro job included an
"Offer Information" sheet on which the "relocation" box was marked
"no." If Digital had budgeted the position for payment of
relocation costs, the "relocation" box would normally be checked
"yes." McMahon accepted the offer despite the "no," apparently
assuming that it referred only to whether benefits were to be
granted initially and not to whether they would be available if she
applied for them later.
 After commuting to Marlboro for several months and
experiencing increasing back pain, McMahon applied for relocation
in the spring of 1991. As promised, Dimieri helped her with the
application, and in McMahon's estimation, "he did try his best." 
Benefits were nonetheless denied. Stephen Yachimski, McMahon's
supervisor at the time, explained the denial in a March 1992
memorandum:
 [Y]our request was reviewed and denied due to the
 unavailability of relocation funds during Q4 FY91 and
 Q1/Q2 of FY92 in US Digital Services.
 The Policy does not allow one to automatically get
 a retroactive relocation based on eligibility alone. 
 While you were eligible under the relocation criteria[,]
 . . . relocation expenses were not approved or budgeted
 in the original personnel requisition per US policy 5.05
 . . . . Since the position was originally posted and
 accepted without relocation, we could only request
 relocation pending available funding.

Although she was dissatisfied with this response, McMahon did not
pursue her request further. Several months later, on June 1, 1992,
she went on disability leave.
B. Digital's Disability Plans
 In June of 1992, when McMahon went on leave, Digital had
several different disability plans in effect. These plans were
outlined for employees in a booklet entitled Your Benefits Book("Benefits Book") and also summarized in Section 4.09 of Digital's
policy manual. 
 The plans were divided into two general categories: 
short-term disability plans and a long-term disability plan. The
long-term disability plan provided optional income protection
insurance, which McMahon elected and paid for through monthly
payroll deductions. Digital's short-term disability benefits
program included three plans: (1) a "Sick Pay Plan," which paid
full salary for twelve days; (2) an "Accident and Sickness Plan,"
which paid 80% of salary for a variable period depending on the
wage class of the employee; and (3) a "Salary Continuation Plan,"
which paid full salary for a variable period depending on the wage
class of the employee. Digital divided its employees into three wage classes: (i) Wage Class 2, for "non-
exempt" employees (those who were paid for overtime hours); (ii) Wage Class 3, for other "non-
exempt" employees; and (iii) Wage Class 4, for "exempt" employees (those who were not paid
overtime hours). [A-315] According to the system outlined in the Benefits Book, Wage Class 2
employees were eligible for the Sick Pay Plan for twelve days and then the Accident and Sickness
Plan for up to six months; Wage Class 3 employees were eligible for the Salary Continuation Plan
up to three months, and then the Accident and Sickness Plan for up to three additional months;
and Wage Class 4 employees were eligible for six months of coverage under the Salary
Continuation Plan. [A-315]
 Section 4.09's description of these plans varied from that in the Benefits Book in four
minor respects: (i) it labeled the "Sick Pay Plan" the "Casual Sick Plan;" (ii) it used the label
"Short Term Disability Plan" only for the remaining two plans (the Accident and Sickness Plan
and the Salary Continuation Plan); (iii) it used the general label "Short Term Disability Plan" for
the plan that provided 80% of salary to Wage Class 2 employees (rather than labeling this the
"Accident and Sickness Plan"); and (iv) it measured the relevant time periods in different units
(ninety-six hours rather than twelve days and thirteen or twenty-six weeks rather than three or six
months). [A-198-202] As a Wage Class 4 employee, McMahon was
subject to the Salary Continuation Plan, and therefore eligible for
up to six months of short-term disability leave with full salary. 
 The Benefits Book informed employees that they were
"guaranteed certain information about the administration of [their]
employee benefit plans and certain rights with regard to these
plans under the Employee Retirement Income Security Act (ERISA)." 
A later section explained that, pursuant to ERISA, the "Digital
benefit plans [were] on file with the Department of Labor," and
listed the "plan numbers" that Digital had assigned:

 [Digital Plan Name:] [Number:]
 Accident and Sickness/Salary Continuation Plans 502
 Long-Term Disability Plan 505

Thus, for ERISA purposes, Digital considered two of the three
short-term disability plans described in the Benefits Book (the
Accident and Sickness Plan and the Salary Continuation Plan) to be
components of a single short-term disability plan, labeled "Plan
502." 
 Plans 502 and 505 were filed with the Department of Labor
pursuant to ERISA 104(a)(1)(B), 29 U.S.C. 1024(a)(1)(B), in the
form of a "Plan Instrument." Digital also filed 5500 Forms (Annual
Reports) with the Internal Revenue Service for Plan 502 and Plan
505 pursuant to 104 and 4065 of ERISA, 29 U.S.C. 1024 and
1365. The 5500 Forms for Plan 502 show that Digital did not fund
Plan 502 solely out of its general assets. During both the 1991
and 1992 plan years, the Plan was partially funded by an insurance
contract with John Hancock Mutual Life Insurance. This insurance
contract was limited, however, to New York employees. Plan 502 was
also secured during both plan years by a $500,000 fidelity bond. 
C. CORE's Management of McMahon's Claim
 Digital hired CORE in 1991 to manage its short-term
disability benefit program, and in particular, to help determine
employees' eligibility for short-term disability benefits. An
employee was eligible under the terms of Digital's short-term
disability plans if he or she was "totally disabled," that is,
"completely unable to perform any and every part of [his or her]
job." CORE was required both to assess initial eligibility for
benefits and to determine an appropriate duration for each leave.
 McMahon filed a short-term disability claim with CORE for
a period beginning June 1, 1992. As permitted, she filed her claim
by having her attending physician call CORE to request a disability
leave. Based on her physician's statement, CORE approved the
requested leave and assigned an initial return-to-work date of July
1, 1992. CORE stayed in close contact with the physicians who were
treating McMahon and extended McMahon's leave several times.
 Eventually, however, CORE determined that McMahon was no
longer eligible for disability benefits. On August 19, 1992, a
CORE representative spoke with Dr. Melvin Law, who was then
McMahon's treating physician. Dr. Law informed CORE that although
McMahon was not able to sit for long periods of time without pain,
he "would be willing to have her [return to work] with
restriction[s]." He outlined those restrictions further in a
letter, in which he stated that McMahon needed to avoid "excessive
bending, lifting, twisting or prolonged sitting without breaks." 
He also proposed a restriction against driving, "[s]ince this
involved prolonged sitting and road vibration . . . ." In a
separate letter, Dr. Law explained: "We evaluated Ms. McMahon in
our office. She has lumbar spine arthritis, which is aggravated by
driving and vibration of her automobile. We think it would be
helpful for this patient to have her job modified so it does not
involve so much driving. If there is any wa[y] to relocate her or
have her work closer to home, we think this would be beneficial." 
CORE communicated these proposed restrictions to a member of
Digital's Disability Management Group, who agreed to accommodate
all but one of the restrictions. Because McMahon's job did not
require driving, Digital determined that there was no need to
accommodate the proposed restriction against driving. 
 On September 4, 1992, Susan Cucinelli, a member of
Digital's Disability Management Group, telephoned McMahon and
informed her that her disability leave had been terminated and that
she needed to return to work. 
D. Return to Work and Aftermath
 In response to Cucinelli's call, McMahon returned to work
on Tuesday, September 8, 1992, after fourteen weeks on disability
leave. She worked only three hours before returning home with back
pain. Over the next three days, McMahon worked a total of seven
more hours. The following Monday, September 14, 1992, McMahon was
called to a meeting with her supervisor and a representative from
personnel. They told her that she had been terminated as part of
a reorganization and reduction of the marketing division. Her last
day at work was September 18, 1992, and her termination was
effective as of November 20, 1992.
 Because Digital had a policy of not terminating employees
who were on disability leave, McMahon complained that Digital had
forced her to return to work before she was medically qualified in
order to be able to terminate her and thereby minimize its
obligation to provide disability benefits. She outlined her
complaint to a personnel representative, who promised to look into
the situation. On September 24, 1992, the personnel representative
called McMahon and informed her that Digital would not rescind her
termination. McMahon took this as a final decision. She did not
follow Digital's procedure for appealing a denial of short-term
disability benefits, nor did she request that she be allowed to
apply for long-term benefits. Instead, McMahon filed suit. 
 II
 McMahon attacks the grant of summary judgment on several
fronts. Her primary argument is that her state law claims are not
preempted by ERISA, both because Digital's Salary Continuation Plan
(the short-term disability plan that had provided her benefits) was
not an ERISA plan and, in any event, because her state law claims
do not relate to the Salary Continuation Plan. In the alternative,
if the Salary Continuation Plan was an ERISA plan, she argues that
the district court failed to consider her ERISA claim for short-
term benefits under that plan. Finally, she contends that the
district court also overlooked her ERISA claim for wrongful
discharge. 
A. ERISA Preemption of State Law Claims
 Congress enacted ERISA in 1974 in order "to promote the
interests of employees and their beneficiaries in employee benefit
plans." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). In
particular, ERISA was designed to safeguard employees from the
abuse and mismanagement of funds that had been accumulated to
finance employee benefits. See Fort Halifax Packing Co. v. Coyne,
482 U.S. 1, 15 (1987). The law was also intended to safeguard
employers' interests by "eliminating the threat of conflicting or
inconsistent State and local regulation of employee benefit plans." 
Shaw, 463 U.S. at 99 (quoting 120 Cong. Rec. 29197, 29933 (1974))
(internal quotation marks omitted). In support of this second
goal, ERISA provided for the preemption of all state law causes of
action "insofar as they may now or hereafter relate to any employee
benefit plan." 29 U.S.C. 1144(a). ERISA preemption analysis
thus involves two central questions: (1) whether the plan at issue
is an "employee benefit plan" and (2) whether the cause of action
"relates to" this employee benefit plan. See Rosario-Cordero v.
Crowley Towing & Transp. Co., 46 F.3d 120, 124 (1st Cir. 1995).
i. Payroll Practice or Employee Welfare Benefit Plan
 ERISA defines "employee benefit plans" to include both
"employee pension benefit plans" and "employee welfare benefit
plans." 29 U.S.C. 1002(3). It defines an "employee welfare
benefit plan" further as:
 any plan, fund, or program which . . . is . . .
 established or maintained by an employer or by an
 employee organization, or by both, to the extent that
 such plan, fund, or program was established or is
 maintained for the purpose of providing for its
 participants or their beneficiaries, through the purchase
 of insurance or otherwise, (A) medical, surgical, or
 hospital care or benefits, or benefits in the event of
 sickness, accident, disability, [or] death . . . .

29 U.S.C. 1002(1). "The question of whether an ERISA plan exists
is 'a question of fact, to be answered in light of all the
surrounding facts and circumstances from the point of view of a
reasonable person.'" Wickman v. Northwestern Nat'l Ins. Co., 908
F.2d 1077, 1082 (1st Cir. 1990) (citing Kanne v. Connecticut Gen.
Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988)).
 Digital's short-term disability plans clearly fell within
this definition in 1002(1). However, not all plans that fall
within the literal definition in 1002(1) are included within the
scope of ERISA. Regulations promulgated by the Secretary of Labor
provide that the term "employee welfare benefit plan" excludes
certain enumerated "payroll practices," including "[p]ayment of an
employee's normal compensation, out of the employer's general
assets, on account of periods of time during which the employee is
physically or mentally unable to perform his or her duties, or is
otherwise absent for medical reasons (such as pregnancy, a physical
examination or psychiatric treatment) . . . ." 29 C.F.R. 2510.3-
1(b)(2). The payroll practice rule thus excludes from ERISA
coverage "traditional sick leave [benefits] . . . paid out of an
employer's general operating funds." Shea v. Wells Fargo Armored
Serv. Co., 810 F.2d 372, 376 (2d Cir. 1987). 
 The exclusion of payroll practices from the scope of
"employee welfare benefit plans" follows from the policy underlying
ERISA, because these types of employee benefits are not vulnerable
to either of the evils that Congress intended to address within the
ERISA framework. Where an employer pays occasional, temporary
benefits from its general assets, there is no benefits fund to
abuse or mismanage and no special risk of loss or nonpayment of
benefits. See California Hosp. Ass'n v. Henning, 770 F.2d 856, 859
(9th Cir. 1985) (discussing policy behind exclusion of ordinary
vacation plans from ERISA's reach).
 McMahon's argument against preemption of her state law
claims relies on the distinction that Digital drew in its Benefits
Book between the Salary Continuation Plan and the Accident and
Sickness Plan, as well as on the difference between payroll
practices and welfare benefit plans. She contends that the Salary
Continuation Plan was a payroll practice, funded by general assets
only, while the Accident and Sickness Plan was an ERISA plan,
funded by the sources mentioned in the 5500 Forms for Plan 502. If
this contention is correct, then McMahon's state law claims would
not be preempted, since, to the extent that her state law claims
relate to a particular Digital benefits plan, they relate to the
Salary Continuation Plan (the source of her benefits as a Wage
Class 4 employee).
 McMahon points to certain evidence in support of her
argument. First, the original Plan Instrument for ERISA Plan 502
labels itself the "Accident and Sickness" plan. Second, the 1991
Restatement of Plan 502 repeats the same label. Third, the 5500
Forms also use the label "Accident and Sickness" for Plan 502 and
refer to the benefits provided under the insurance contract with
John Hancock as "Accident and Sickness" benefits. In isolation,
these facts suggest that, of the short-term disability plans
described in the Benefits Book, only the Accident and Sickness Plan
was included within Plan 502 and only Accident and Sickness Plan
benefits were funded by anything other than Digital's general
assets.
 However, when read as a whole, the record does not
support McMahon's depiction of Digital's short-term disability
program. To the contrary, undisputed facts in the record
demonstrate that Digital treated the Accident and Sickness Plan and
the Salary Continuation Plan as two components of a single ERISA
short-term benefits plan, and furthermore that benefits under both
plans were partially funded by insurance and secured by a fidelity
bond. 
 A number of facts show that Digital intended Plan 502 to
include the Salary Continuation Plan. The Benefits Book, which as
the "summary plan description" for Plan 502 took precedence over
any conflicting documents, see Santiago Rolon v. Chase Manhattan
Bank, 912 F. Supp. 19, 22 (D.P.R. 1996) (citing Hansen v.
Continental Ins. Co., 940 F.2d 971, 981-82 (5th Cir. 1991)), stated
that Digital had assigned the number 502 to the "Accident and
Sickness/Salary Continuation Plans." Further, although the 1991
Restatement of Plan 502 designates itself the "Accident and
Sickness" plan (following, presumably, the designation on the
original 1978 Plan Instrument), it also repeats the system of plans
described in the Benefits Book and refers expressly to both
Accident and Sickness and Salary Continuation benefits. Digital's
expert confirmed this understanding when she testified that the
label "Accident and Sickness" on the 1991 Restatement of Plan 502
merely meant "short-term disability plan." 
 Having determined that Plan 502 included both the
Accident and Sickness Plan and the Salary Continuation Plan, we
must also conclude that both of these plans were tied to funding
separate from Digital's general assets, since the 5500 Forms for
Plan 502 listed the fidelity bond and the John Hancock insurance
policy without limiting their coverage to Accident and Sickness
Plan benefits. 
 Thus, McMahon's payroll practice argument is wrong 
because her benefits derived from an employee welfare benefit plan
(Plan 502) that was supported by assets outside of Digital's
general operating funds. Such a plan cannot be a payroll practice
under the express terms of 29 C.F.R. 2510.3-1(b)(2).
 Two clarifications are in order. First, it follows from
the logic of the payroll practice exception that the question of
funding must pertain to the plan as a whole, not to the source of
funding for any particular employee. Thus, it is not relevant to
our analysis that the John Hancock insurance policy for Plan 502
only extended to New York employees and did not actually cover
McMahon's benefits as a Massachusetts employee. McMahon conceded
this point at oral argument.
 Second, McMahon raises the issue (obliquely) in her
briefs of whether under certain circumstances a plan with a de
minimis amount of outside funding might still be considered a
payroll practice. She suggests that the overall amount of outside
funding for Plan 502 may have been too small to take the Plan
outside the bounds of the payroll practice rule. 
 Her suggestion is not frivolous, since employees eligible
for a benefit plan that was almost entirely funded from an
employer's general assets would not be exposed to a substantial
risk of fund abuse or mismanagement. Imposing a threshold would
also reduce the risk of "regulation shopping," whereby an employer
could choose ERISA regulation over (conceivably stricter) state
regulation merely by segregating a small benefits fund from its
general assets.
 However, this suggestion need go no further here because
there is another reason to reject the application of the payroll
practice rule to Plan 502: Digital's treatment of the Plan as an
ERISA plan. Digital held the Plan out to its employees as an ERISA
plan and filed documents with the Department of Labor and the IRS
acknowledging the Plan's status as an ERISA plan. As the district
court pointed out, these facts alone provide a strong reason to
find ERISA coverage. We do not hold that an employer's mere
labeling of a plan determines whether a plan is an ERISA plan,
since this also could lead to a form of "regulation shopping." But
where, as here, an employer partially funds a plan from sources
outside of its general assets, files documents with the Department
of Labor and the IRS consistent with the plan's ERISA status, and
informs employees that the plan is subject to ERISA regulation, we
find that the plan is an ERISA plan and not a payroll practice.
ii. "Related To"
 The remaining question under ERISA preemption analysis is
whether McMahon's state law claims "relate to" Plan 502. "A law
'relates to' an employee benefit plan . . . if it has a connection
with or reference to such a plan." Ingersoll-Rand Co. v.
McClendon, 498 U.S. 133, 139 (1990) (quoting Shaw v. Delta Air
Lines, Inc., 463 U.S. 85, 96-97 (1983)) (internal quotation marks
omitted). Ingersoll-Rand identified two tests for determining
whether a state cause of action "relates to" an ERISA plan. See 498
U.S. at 140-42. Only the first test is relevant here: a state law
cause of action is expressly preempted by ERISA where a plaintiff,
in order to prevail, must prove the existence of, or specific terms
of, an ERISA plan. See id. at 140; see also Vartanian v. Monsanto
Co., 14 F.3d 697, 700 (1st Cir. 1994)(interpreting Ingersoll-Randtest). 
 McMahon's claims against CORE for negligence, breach of
contract, and interference with an advantageous business
relationship are all preempted under this test. Each of these
claims relies on her assertion that she was still eligible after
September 8, 1992 for short-term disability benefits under the
terms of Plan 502.
 McMahon unsuccessfully attempts to avoid this result by
characterizing her claims against CORE as malpractice claims. She
relies on cases holding that malpractice claims against managed
care providers are not preempted by ERISA. See, e.g., Pacificare
of Oklahoma v. Burrage, 59 F.3d 151, 154-55 (10th Cir. 1995). But
CORE was not a managed care provider; it was not responsible for
providing McMahon with medical care, but rather for determining
whether McMahon was eligible for short-term disability leave. 
Whether CORE performed this responsibility properly clearly
"relates to" the terms of Plan 502. 
 All but one of McMahon's claims against Digital are also
clearly preempted. Her claims for breach of contract, negligent
administration, unfair trade practices, and interference with an
advantageous relationship all require her to prove the terms of an
ERISA plan, because she could not prevail under any of these claims
unless she could show that her inability to commute from Nashua to
Marlboro rendered her "totally disabled" under Plan 502's definition
of that term. 
 The remaining state law claim is that Digital violated a
contractual promise to relocate McMahon to Marlboro (or
alternatively, made a promise to relocate her on which she
reasonably relied). This claim is closely connected to her other,
preempted state law claims, since Digital's failure to relocate her
in the spring of 1991 eventually led to her need for disability
leave. It is also related to her other claims in the sense that
Digital's refusal to relocate her in August 1992 stemmed in part
from its rejection of the idea that relocation could be an
appropriate disability accommodation. Nonetheless, we find that
her relocation claim does not "relate to" an ERISA plan under the
Ingersoll-Rand test. To prevail on her relocation claim, McMahon
must show that Digital agreed to pay for relocation, if she decided
to request it. Because McMahon could make this showing without
reference to any Digital disability benefit plan, her relocation
claim escapes the reach of the ERISA preemption doctrine. 
B. The State Law Relocation Claim
 The district court recognized that the relocation claim
might not be preempted and, as an alternative basis for its grant
of summary judgment, found that McMahon's claim also failed on the
merits, because she failed to show that she suffered any damages as
a result of Digital's failure to relocate her. We find this
ground doubtful, but affirm on a different ground, namely, that a
reasonable factfinder could not conclude that Digital had promised
to relocate McMahon. See Hodgens v. General Dynamics Corp., 144
F.3d 151, 173 (1st Cir. 1998) ("We will affirm a correct result
reached by the court below on any independently sufficient ground
made manifest by the record." (internal quotation marks and
citation omitted)). 
 McMahon's breach of contract claim is based on the
language of Digital's written relocation policy (Section 5.05). 
Under Massachusetts law, an employer's written policies create an
enforceable contract only under certain circumstances, see Jacksonv. Action for Boston Community Dev., Inc., 525 N.E.2d 411, 415
(Mass. 1988), and the factors that courts apply, see id. at 415-16,
point away from contractual status here. But even assuming that
McMahon could enforce the language of Section 5.05, that language
does not support her argument.
 Section 5.05 lists two separate criteria for the award of
relocation benefits: (1) an employee's position must be "approved
and budgeted for Relocation by the appropriate management levels"
and (2) the employee must meet certain mileage criteria. McMahon
focuses on the second criterion while ignoring the first. Because
McMahon's position in Marlboro was not budgeted for relocation
benefits (as demonstrated by the box checked "no" on her Offer
Information Sheet), she could not assume from the language in
Section 5.05 that benefits would be "a given" once she applied for
them.
 McMahon's alternative promissory estoppel claim suffers
from a similar fatal weakness. Assuming dubitante that Dimieri
misunderstood the written policy and thus promised McMahon that
benefits were "a given," we find that it was unreasonable, as a
matter of law, for McMahon to rely on this promise. Where a
written statement conflicts with an oral statement, Massachusetts
law assumes that a reasonable person will investigate further. 
See Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1124 (1st
Cir. 1995) (applying Massachusetts law). Recovery under a
promissory estoppel theory is not possible where a plaintiff has
simply chosen to believe the more appealing of two conflicting
statements. See id.
C. ERISA Claims
 The district court dismissed McMahon's claim for long-
term disability benefits under 502 of ERISA, 29 U.S.C. 1132, 
because McMahon failed to exhaust her administrative remedies when
she chose not to even apply for long-term disability benefits. SeeMcMahon, 998 F. Supp. at 69-70; see also Kross v. Western Elec.
Co., 701 F.2d 1238, 1243-45 (7th Cir. 1983) (explaining the policy
concerns that underlie the discretionary, court-adopted exhaustion
rule for ERISA claims); Drinkwater v. Metropolitan Life Ins. Co.,
846 F.2d 821, 825-26 (1st Cir. 1988) (applying the exhaustion
rule). 
 McMahon does not pursue this claim on appeal, but she
does press an ERISA claim for short-term disability benefits, which
she contends the district court failed to address. Digital argues
that McMahon waived this claim by failing to clearly raise it
before the district court. We decline to decide the waiver
question here, because we find that even if this claim were not
waived, it fails on the merits.
 Uncontested evidence in the record shows that McMahon was
not "totally disabled" under Digital's definition of that term when
she returned to work on September 8, 1992: she was not "completely
unable to perform any and every part of [her] job." Her physician
had cleared her to return to work, with some restrictions which
Digital accommodated. The fact that McMahon had difficulty with
the long commute, while unfortunate, did not make her eligible for
benefits under Digital's short-term disability plan. 
 Finally, McMahon pursues a third ERISA claim, that the
Plan Administrator and Digital violated the wrongful discharge
prohibition in 510 of ERISA, codified at 29 U.S.C. 1140. We
reject this claim on waiver grounds, because it is clear that
McMahon failed to raise a 1140 claim before the district court. 
See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir.
1995) (concluding that a claim arguably present in the complaint
but not addressed in a memorandum opposing summary judgment has
been waived).
 
 
 III
 The decision of the district court is affirmed. Costs
are awarded to defendants.